IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


**WESLEY GOLDWIRE,**

    **Petitioner,**

**vs.**
                                          **CASE NO. 4:07cv340-SPM/WCS**

**WALTER A. McNEIL,**[1]

    **Respondent.**

                                   **/**

## REPORT AND RECOMMENDATION

This is a petition for writ of habeas corpus filed by Wesley Goldwire pursuant to 28 U.S.C. § 2254. Doc. 1. Petitioner also filed portions of the state record. Doc. 2. Petitioner challenges his conviction for armed carjacking with a firearm in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 03-63CFA. Respondent filed an answer, doc. 12, and the state record in paper form, doc. 13, agreeing that the petition is timely and that state court remedies were exhausted.

---

[1] Walter A. McNeil succeeded James McDonough as Secretary for the Department of Corrections, and is automatically substituted as Respondent. FED. R. CIV. P. 25(d).

Petitioner filed a traverse. Doc. 15. Hereafter, references to exhibits are to those filed as doc. 13.

**State Procedural History**

Petitioner was convicted after a jury trial. His conviction was affirmed on direct appeal. He then filed a Rule 3.850 motion, which was denied, and that judgment was affirmed on appeal.

The trial evidence is summarized in Petitioner's initial brief on direct appeal, Ex. F., with further explanation herein from excerpts from the trial testimony itself, Ex. C (trial transcript). The motor vehicle in question was a blue Buick owned by Martell Banks. Ex. F, p. 2. Banks allowed his girlfriend, Lashonda Hinson, to use the car on the night of January 26, 2003. *Id.* She was the only person who had his permission to use the car. *Id.*, p. 3. This was the night of the Super Bowl game, which ended according to Investigator Craig Norris, at about 11:00 p.m. Ex. C, p. 81

Hinson testified that she picked up Rontarious Wright that evening, the night of the Super Bowl game. Ex. F, p. 3. Wright insisted on driving the car and Hinson let him. *Id.* She later picked up her cousin, Shakeeta Ceasor. *Id.* The three then drove to Chattahoochee to pick up Wright's cousin, Terry Conyers. *Id.* The four then drove back to Quincy to the Gadsden Arms Apartments. *Id.* At the complex, said Hinson, Wright and Conyers went to an apartment and spoke to another man. *Id.* They all then drove away to an unlit dirt road. *Id.* Hinson said that a short way down the road, they spotted a black man, dressed all in black, with a sweatshirt covering his head. *Id.* At the suggestion of Conyers, Wright stopped the car to ask if the man wanted a ride. *Id.* The

man on the road then "stuck a gun into the car, ordered everyone out, and made off with the vehicle."  *Id.*  Hinson ran into the bushes and called 911.  *Id.*

During the testimony of Hinson, and over an objection, Petitioner was ordered to yell for the jury:  "Get out of the car.  Get out of the car."  *Id.*, p. 4.  He did so twice.  *Id.*

Conyers testified that he entered a guilty plea to the carjacking charge.  *Id.*  He said he gave Petitioner a sawed off .410 shotgun prior to the evening in question.  *Id.*  Conyers testified at trial that on that evening, he was in Chattahoochee at his home, and he watched the Super Bowl *until the end*.  Ex. C, p. 55.  After the game, his cousin, Rontarious Wright, came over.  *Id.*, p. 56.  Conyers said that he and Wright, went "to get the gun back from [Petitioner] so that Wright could commit a crime."  Ex. F, p. 4.  Conyers said they drove to Petitioner's apartment at the Gadsden Arms Apartments and met with Petitioner.  Ex. C, pp. 67-68.  Conyers said that he, Wright, and Petitioner met that evening and "devised a plan carjack the blue Buick."  Ex. F, p. 4.  As Conyers put it at trial, Wright told him:

> Man, I got some ho's out in the car, you know what I'm saying, to rob, you know what I'm saying? Let's do this lick."

Doc. 13, Ex. C (trial transcript), p. 70.  Conyers said that after the robbery, he and Wright meet up with Petitioner and the three of them "drove around in the stolen vehicle."  Ex. F, p. 4.

Police Investigator Craig Norris said that early in the investigation, the police suspected that Conyers, Wright, and Petitioner had committed the robbery.  *Id.*, p. 5.  He interrogated Petitioner, who denied involvement, yet spontaneously offered information as to how he had been solicited by Conyers and Wright to do the robbery.

*Id.* Norris said that Conyers told him that Petitioner had the sawed off shotgun. *Id.* Norris testified at trial that the place on the dirt road where the robbery took place is 150 to 200 yards from Petitioner's residence. Ex. C, p. 87. He said that after the robbery, the Buick was stripped, abandoned, and the items sold. *Id.*, p. 96.

Petitioner called his grandmother, Janice Giles, as a witness in defense. Ex. F., p. 5. She testified that the night of January 26, 2003, was the night of the Super Bowl football game. *Id.* She said that Petitioner lived with her full-time and was home with her "the whole night." *Id.* She said that a young black man came by her residence during the game asking for Petitioner, but she did not know the man. *Id.* She said that the man returned after Petitioner was arrested, told her he knew that Petitioner was not involved, and that he intended to turn himself in. *Id.*, p. 6. Alicia Giles, Petitioner's aunt, testified that she was at the same residence watching the Super Bowl that evening, and that Petitioner was there "all night long." Caroline Giles, Petitioner's mother, testified that Petitioner never left the same residence "during the Super Bowl game." *Id.*

Petitioner testified that he was "home sick that day." *Id.* He said he was watching the Super Bowl. *Id.* He said that Conyers came by "looking to borrow some money." *Id.* Petitioner said he told Conyers "no," that his Grandmother's jar of money was "sitting within view, which angered Conyers." *Id.* Petitioner said he did not leave the house that night. *Id.* The jury convicted after deliberating twenty-eight minutes. *Id.*

**Section 2254 Standard of Review**

A petitioner is entitled to federal habeas relief as to legal findings only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States." § 2254(d)(1).  "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court holdings.  Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted); Carey v. Musladin, 549 U.S. 70, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings.  Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495, 1519-1520, 146  L.Ed.2d 389 (2000); Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citing Williams).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850.  *See also*, Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858-2859, 168 L.Ed.2d 662 (2007) (discussing the unreasonable application standard) (citing Williams, other citations omitted).

"Avoiding these pitfalls [described in Williams v. Taylor] does not require citation of our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early

v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (emphasis in original).  Further, "whether a state court's decision was unreasonable must be assessed in light of the record the court had before it."  Holland v. Jackson, 542 U.S. 649, 652, 124 S.Ct. 2736, 2738, 159 L.Ed.2d 683 (2004).

The law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."  Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S. 1204 (2001).  *See also*, Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing Chandler).

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

outcome." 466 U.S. at 694, 104 S.Ct. at 2068.  Although Strickland explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."  466 U.S. at 697, 104 S.Ct. at 2069.

A state court's adjudication of an ineffective assistance claim is not "contrary to" the rule of Strickland as intended by § 2254(d)(1) even if this court might have applied Strickland differently.  Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122 S.Ct. at 1852.  To determine whether the state court's adjudication was an "unreasonable application" of Strickland, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  Bell, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* Williams).  "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  Williams v. Taylor, 529 U.S. at 410, 120 S.Ct. at 1522.

**Ground One**

Petitioner contends that his attorney was ineffective at trial for failing to object to admission of a photograph of the stolen automobile on the grounds that it violated the labeling requirements of FLA. STAT. § 90.91.  That statute provides for use of a photograph as a substitute at trial for the property that is the subject of a wrongful taking.  It states:

> In any prosecution for a crime involving the wrongful taking of property, a photograph of the property alleged to have been wrongfully taken may be deemed competent evidence of such property and may be admissible in

> the prosecution to the same extent as if such property were introduced as evidence. *Such photograph shall bear a written description of the property alleged to have been wrongfully taken, the name of the owner of the property, the location where the alleged wrongful taking occurred, the name of the investigating law enforcement officer, the date the photograph was taken, and the name of the photographer.* Such writing shall be made under oath by the investigating law enforcement officer, and the photograph shall be identified by the signature of the photographer. Upon the filing of such photograph and writing with the law enforcement authority or court holding such property as evidence, the property may be returned to the owner from whom the property was taken.

FLA. STAT. § 90.91 (emphasis added). In the Rule 3.850 proceedings, Respondent conceded that the photograph was admitted into evidence without "a written description of the property, the owner's name, the location of the theft, the name and oath of the investigating officer, the date the photographs were taken, or the photographer's name and signature." Ex. K, R. 23.

This claim was raised in Petitioner's Rule 3.850 motion and was denied. The trial court found that had an objection been made by Petitioner's lawyer, it "may have been sustained." Ex. M, R. 27. The court concluded, however, that Petitioner failed to show that he suffered any prejudice. *Id.* The court said:

> The owner's description of the vehicle matched the vehicle depicted in the photograph. Moreover, there is no allegation or demonstration that the State would not have been able to authenticate the photograph, if required to do so.

*Id.*

This ruling is plainly correct. The investigator, Craig Norris of the Quincy Police Department testified at trial, Ex. C, pp. 79-100, and he could have provided all of the details that FLA. STAT. § 90.91 requires. Martell Banks, the owner of the vehicle, described it as a 1991 blue Buick Regal, and then he identified the car in the

Case No. 4:07cv340-SPM/WCS

photograph as his car. *Id.*, p. 22. This was sufficient to authenticate the photograph. There is no evidence then or now that the motor vehicle in the photograph was not the motor vehicle stolen from Martell Banks. Indeed, the photograph was useful only to prove that the motor vehicle that was stolen was owned by Banks, but that point was not contested. The pivotal issue at trial was whether Petitioner was the person on the dark road in the mask with the shotgun. Petitioner's defense was that he was in his apartment with his family when the crime was committed. *Id.*, pp. 187-190, 212-213. Petitioner has not shown that the state court's adjudication of the merits of this federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

**Ground Two**

Petitioner argues that the prosecutor improperly asked leading questions of Terry Conyers and Investigator Norris. Doc. 1, p. 4. He claims that his attorney was ineffective for failing to make objections. Petitioner does not describe the leading questions that were asked, nor does he present argument as to why those questions were objectionable. Petitioner did not cure this defect in his claim when he filed his response. He simply repeats the claim without specifics. Doc. 15, pp. 6-7.

A claim of ineffective assistance of counsel requires proof of both attorney error and prejudice to the outcome. Strickland v. Washington, *supra,* 466 U.S. at 686, 104 S.Ct. at 2064. "A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066.

"Conclusory allegations of ineffective assistance are insufficient." Wilson v. United States, 962 F.2d 996, 998 (11th Cir. 1992) (drug quantity at sentencing, failure to allege specific facts), *quoting*, United States v. Lawson, 947 F.2d 849, 853 (7th Cir. 1991) (same); Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th Cir. 1985), *cert. denied*, 479 U.S. 918 (1986) (defendant's conclusory allegations about the testimony of uncalled witnesses were insufficient to state a claim of ineffective assistance of counsel); Bolder v. Armontrout, 921 F.2d 1359, 1363-1364 (8th Cir. 1990), *cert. denied*, 502 U.S. 850 (1991); United States v. Vargas, 920 F.2d 167, 169-170 (2d Cir. 1990), *cert. denied*, 502 U.S. 826 (1991). Ground two, therefore, is unsupported and fails to state a claim of ineffective assistance of counsel.

**Ground Three**

Petitioner contends that his attorney was ineffective for failing to object to prosecutorial misconduct in closing argument. Doc. 1, p. 5. Petitioner argues that his attorney should have objected when the prosecutor repeatedly called the Petitioner and his witnesses "liars." *Id.* He cites pages 218-219 and 225-232 of the transcript, Exhibit C, in support of this claim. *Id.*

In closing argument, the prosecutor began his argument upon the subject of truth. Ex. C, p. 218. He argued:

> Odd as it seems, the truth can come out of many different places and many different types of witnesses. The facts of this case support the fact that a bad person has told the truth and some good people have not. The way we can find out is by looking at all the evidence and establishing what is consistent.
>
> It's funny thing about a lie. Lies, they fall apart. They get – When you look at something, if you've ever had to sit there and watch and try to figure out who's telling the truth in a situation, you compare it to what else you know.

> . . . It's the details that show that Terry Conyers came in here and told us the truth today and that Mr. Goldwire's family did not.

*Id.*, pp. 218-219.  The prosecutor argued that Terry Conyers told the truth because it made no sense that he would plead guilty to a crime that did not happen.  *Id.*, p. 220.  He argued that there was "no evidence to show any reason why he would sit there and say the name 'Wesley Goldwire.' "  *Id.*  The prosecutor argued that Petitioner's attorney could argue that Conyers was "lying," but he argued that the "only thing that can get him in worse trouble is lying."  *Id.*, p. 221.

The prosecutor argued that Hinson had "no reason to lie."  *Id.*  He argued that the robbery occurred shortly after Hinson and the others had stopped and the others had met a "man" at Petitioner's apartment.  *Id.*, p. 222.  The prosecutor then carefully explored the inconsistencies in the testimony.  *Id.*, pp. 224-225.  He argued that Petitioner's witnesses, family members, had an "extraordinary interest" to help Petitioner out.  *Id.*, p. 225.  He said:

> I'm not saying they're bad people; but they've committed perjury.  They lied.  He left the house.  It doesn't make sense otherwise.  The inconsistencies in their stories can only be explained by the fact that there was a lie afoot in this courtroom today.  The fact that they were sitting there and just making up illnesses, making up when people were coming and going.  The game [Super Bowl] had been over.  Keep in mind that this crime didn't occur until close to midnight.  The game, by everybody's testimony, ended at 10:30.

*Id.*, pp. 225-226.  The prosecutor argued:

> Mr. Hobbs [Petitioner's lawyer] is an excellent attorney.  Had Terry Conyers been lying today, it would have shone through.  He would have ripped him apart.  He is a bad person.

*Id.*, p. 226. The remainder of the argument covered the evidence, arguing for the truth of the prosecutor's case and against the truth of the witnesses for Petitioner. *Id.*, pp. 226-232. The prosecutor ended by saying:

> This case is clear. It's difficult because there's so many lies flying around, but look at the details and see how the truth shines through here. Have the courage to realize, like we talked about during jury selection that, in fact, a bad person can tell the truth and a good person can tell a lie. It happened.

*Id.*, p. 232.

The prosecutor did not call the witnesses "liars," which might imply a congenital inability to speak the truth. He said they lied. Ex. M, p. 27. The state court made this point, finding nothing objectionable in this argument under Florida law. The purpose of closing argument under Florida law is to review the evidence with the jury and to argue inferences that may be drawn from the evidence:

> The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence. Conversely, it must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.

Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985); Dessaure v. State, 891 So. 2d 455, 468 (Fla. 2004). "Merely arguing a conclusion that can be drawn from the evidence is permissible fair comment." Mann v. State, 603 So. 2d 1141, 1143 (Fla. 1992).

It is well-established that argument may be made as to questions of credibility from the trial evidence, including credibility as revealed by the demeanor of a witness. Watkins v. Sims, 81 Fla. 730, 741, 88 So. 764, 767 (Fla. 1921). It is also well-established that the prosecutor may argue that a witness "lied" if that characterization is

based upon trial evidence. State v. Comesana, 904 So. 2d 462, 463-464 (Fla. 3d DCA 2005).

> Both the prosecutor and defense counsel are granted wide latitude in closing argument. *See Ford v. State*, 802 So. 2d 1121, 1129 (Fla.2001). No area is more deserving of "wide latitude" than the defendant's ability in a criminal case to argue the "credibility and biases of the witnesses who testified at trial." *Goodrich v. State*, 854 So. 2d 663, 665 (Fla. 3d DCA 2003).

Williams v. State, 912 So. 2d 66, 68 (Fla. 4th DCA 2005).

Prosecutorial misconduct has not been established, so ineffective assistance of counsel in failing to object has not been shown. Consequently, Petitioner has not shown that the state court's adjudication of the merits of this federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

**Conclusion**

Accordingly, it is **RECOMMENDED** that this 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Wesley Goldwire challenging his conviction for armed carjacking with a firearm in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 03-63CFA, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on September 24, 2008.

                                             s/    William C. Sherrill, Jr.
                                             **WILLIAM C. SHERRILL, JR.**
                                             **UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**